## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | CHAPTER 7 |
| | ) | |
| TZEW HOLDCO LLC, *et al.*,[1] | ) | CASE NO. 20-10910-KBO |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| _____ | ) | |
| | | |
| JEOFFREY L. BURTCH, | ) | |
| Chapter 7 Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | ADV. CASE NO. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| TYLER ZACHEM, an individual, | ) | |
| DAVID BASTO, an individual, | ) | |
| JOHN OVERBAY, an individual, | ) | |
| JOHN MALLOY, an individual, | ) | |
| JEFFREY FRIENT, an individual, | ) | |
| DAVID TOLMIE, an individual, | ) | |
| MICHAEL SHORT, an individual, and | ) | |
| JEFFREY DANE, an individual, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## ADVERSARY COMPLAINT FOR DAMAGES AND
## OTHER RELIEF AND DEMAND FOR JURY TRIAL

The Plaintiff, JEOFFREY L. BURTCH (the "Trustee" or "Plaintiff"), Chapter 7 Trustee of

and for the estates (collectively, the "Estate") of the above-captioned Debtors (collectively, the

"Debtors" or the "Company") in the above-referenced jointly-administered bankruptcy cases, files

---

[1] The Debtors in these Chapter 7 cases, along with the last four digits of each entity's federal tax identification number and respective bankruptcy case numbers, are: (i) TZEW Holdco LLC (0252), 20-10910 (KBO); (ii) PP Group, LLC f/k/a Apex Parks Group, LLC d/b/a TZEW, LLC (5579), 20-10911 (KBO); (iii) PP Property Holdings, LLC f/k/a Apex Real Property Holdings, LLC (1013), 20-10912 (KBO); (iv) PP Parks Beverage Company, LLC f/k/a Speedzone Beverage company, LLC (2339), 20-10913 (KBO); (v) PP Parks Holdings, LLC f/k/a Speedzone Holdings, LLC (7913), 20-10914 (KBO); (vi) PP Parks Management, LLC f/k/a Speedzone Management, LLC (2937), 20-10915 (KBO); and (vii) TZEW Intermediate Corp d/b/a TZEW Corp. (1058), 20-10916 (KBO).

this Adversary Complaint for Damages and Other Relief and Demand for Jury Trial (the "Complaint") against the Defendants, TYLER ZACHEM, an individual, DAVID BASTO, an individual, JOHN OVERBAY, JOHN MALLOY, an individual, DAVID TOLMIE, an individual, JEFFREY FRIENT, an individual, MICHAEL SHORT, an individual, JEFFREY DANE, an individual (the foregoing named defendants shall sometimes collectively be referred to herein as the "Defendants"),[2] and alleges:

## THE PARTIES, JURISDICTION & VENUE

1.      In this action, the Trustee seeks damages totaling in excess of $20 million against the Defendants – former managers, officers, directors and/or control persons of the Debtors – for breaches of their fiduciary duties of loyalty, good faith, and care under Delaware, Texas, and/or other applicable statutory and common law, as applicable.

2.      On April 8, 2020 (the "Petition Date"), Debtors TZEW Holdco LLC ("Holdco"), along with its affiliated business entities, (i) PP Group, LLC f/k/a Apex Parks Group, LLC d/b/a TZEW, LLC ("Apex Parks"), (ii) PP Property Holdings, LLC f/k/a Apex Real Property Holdings, LLC, (iii) PP Parks Beverage Company, LLC f/k/a Speedzone Beverage company, LLC, (iv) PP Parks Holdings, LLC f/k/a Speedzone Holdings, LLC, (v) PP Parks Management, LLC f/k/a Speedzone Management, LLC and (vi) TZEW Intermediate Corp. d/b/a TZEW Corp. ("TZEW Corp."), filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3.      On June 4, 2020, the Court entered an order approving, among other relief, the sale

---

[2] In compliance with Fed. R. Bankr. P. 7020 regarding the joinder of multiple parties in a single action, the claims asserted against the named Defendants arise out of the same series of acts and omissions and involve common issues of law and fact.

of assets of the Debtors to APX Operating Company, LLC [D.I. 300], with the sale closing on June 8, 2020.

4.      On February 17, 2021, the Court entered its Order Converting Case from Chapter 11 to Chapter 7 of the Bankruptcy Code. [D.I. 552].

5.      On February 18, 2021, Jeoffrey L. Burtch, the Plaintiff in this action, was appointed trustee pursuant to Section 701 of the Bankruptcy Code, and presently serves as the trustee pursuant to Section 702(d) of the Bankruptcy Code

6.      As the duly appointed and acting Chapter 7 Trustee of the Estate of the Debtors, Plaintiff has: (i) the authority to enforce, sue on, prosecute, settle, or compromise all litigation claims that the Estate may hold against any person or entity including, but not limited to, all state and federal claims; and (ii) standing to prosecute the claims that are the subject matter of this action.

7.      At all or certain times material hereto, the below-named Defendants were managers, officers, directors, and/or control persons of the Debtors holding *de facto* and/or *de jure* titles and positions with the Debtors:

    a.   Defendant TYLER ZACHEM ("Zachem") is an individual who, at all or certain times material hereto, held the titles or positions of chairman, manager, member of the board of managers, director, officer, and/or president of all or certain of the Debtors, including but not necessarily limited to serving as the Chairman of the Board of Managers of Holdco, manager and member of the Board of  Managers of Holdco, manager and/or director of Holdco's subsidiaries, including but not limited to manager and member of the Board of Managers of Apex Parks and director of TZEW Corp., and president of all or certain of the Debtors, and was otherwise acting within the scope of his duties

as a manager, officer, director, and/or control person of the Debtors. As a result of the positions and titles he held and duties he performed, Zachem had or should have had an intimate knowledge and understanding of, and was or should have been materially involved in and with, all material financial, operational, regulatory, accounting, and/or business related affairs and functions of the Debtors. In addition, at all or certain times material hereto, Zachem was an owner, officer, director, manager, and/or control person of The Carlyle Group which, along with its affiliated business entities, BroadSky Partners LLC, BSP Partners I, L.P., and TTZ Cap Partners LLC, directly and/or indirectly owned material membership unit interests in the Debtors with the right to appoint two members to Holdco's Board of Managers when comprised of four members at certain times material hereto, the right to appoint two members and one additional member jointly with The Edgewater Funds, and/or their affiliated business entities, Edgewater Growth Capital Partners III, L.P. and Edgewater Growth Capital Partners III Co-Invest Fund, L.P. when comprised of five members at certain times material hereto, and upon information and belief the right to appoint two members and two additional members jointly with The Edgewater Funds, and/or their affiliated business entities, Edgewater Growth Capital Partners III, L.P. and Edgewater Growth Capital Partners III Co-Invest Fund, L.P. when comprised of six members at certain times material hereto. Zachem was appointed as Holdco's Chairman and member of Board of Managers pursuant to such right of appointment, which appointment also served to appoint Zachem as manager and/or director of Holdco's subsidiaries, including but not limited to manager and member of the

4

Board of Managers of Apex Parks and director of TZEW Corp.

b.  Defendant DAVID BASTO ("Basto") is an individual who, at certain or all times material hereto, held the titles or positions of manager, member of the board of managers, director, officer, and/or secretary of all or certain of the Debtors, including but not necessarily limited to serving as manager and member of the Board of Managers of Holdco, manager and/or director of Holdco's subsidiaries, including but not limited to manager and member of the Board of Managers of Apex Parks and director of TZEW Corp., and secretary of all or certain of the Debtors, and was otherwise acting within the scope of his duties as a manager, officer, director, and/or control person of the Debtors. As a result of the positions and titles he held and duties he performed, Basto had or should have had an intimate knowledge and understanding of, and was or should have been materially involved in and with, all material financial, operational, regulatory, accounting, and/or business related affairs and functions of the Debtors.  In addition, at all or certain times material hereto, Basto was an owner, officer, director, manager, and/or control person of The Carlyle Group which, along with its affiliated business entities, BroadSky Partners LLC, BSP Partners I, L.P., and TTZ Cap Partners LLC, directly and/or indirectly owned material membership unit interests in the Debtors with the right to appoint two members to Holdco's Board of Managers when comprised of four members at certain times material hereto, the right to appoint two members and one additional member jointly with The Edgewater Funds, and/or their affiliated business entities, Edgewater Growth Capital Partners III, L.P. and Edgewater Growth Capital Partners III Co-Invest Fund, L.P. when

5

comprised of five members at certain times material hereto, and upon information and belief the right to appoint two members and two additional members jointly with The Edgewater Funds, and/or their affiliated business entities, Edgewater Growth Capital Partners III, L.P. and Edgewater Growth Capital Partners III Co-Invest Fund, L.P. when comprised of six members at certain times material hereto. Basto was appointed as member of Holdco's Board of Managers pursuant to such right of appointment, which appointment also served to appoint Basto as manager and/or director of Holdco's subsidiaries, including but not limited to manager and member of the Board of Managers of Apex Parks and director of TZEW Corp.

c.   Defendant JOHN OVERBAY ("Overbay") is an individual who, at certain or all times material hereto, held the titles or positions of manager, member of the board of managers, director, officer, president, and/or chief executive officer of all or certain of the Debtors, including but not necessarily limited to serving as manager and member of the Board of Managers of Holdco, manager and/or director of Holdco's subsidiaries, including but not limited to manager and member of the Board of Managers of Apex Parks and director of TZEW Corp., and president and/or chief executive officer of all or certain of the Debtors, and was otherwise acting within the scope of his duties as a manager, officer, director, and/or control person of the Debtors. As a result of the positions and titles he held and duties he performed, Overbay had or should have had an intimate knowledge and understanding of, and was or should have been materially involved in and with, all material financial, operational, regulatory, accounting, and/or business related affairs and functions of the Debtors. In

addition, at all or certain times material hereto, Overbay was an owner, officer, director, manager, and/or control person of The Carlyle Group which, along with its affiliated business entities, BroadSky Partners LLC, BSP Partners I, L.P., and TTZ Cap Partners LLC, directly and/or indirectly owned material membership unit interests in the Debtors with the right to appoint two members to Holdco's Board of Managers when comprised of four members at certain times material hereto, the right to appoint two members and one additional member jointly with The Edgewater Funds, and/or their affiliated business entities, Edgewater Growth Capital Partners III, L.P. and Edgewater Growth Capital Partners III Co-Invest Fund, L.P. when comprised of five members at certain times material hereto, and upon information and belief the right to appoint two members and two additional members jointly with The Edgewater Funds, and/or their affiliated business entities, Edgewater Growth Capital Partners III, L.P. and Edgewater Growth Capital Partners III Co-Invest Fund, L.P. when comprised of six members at certain times material hereto. Overbay was appointed as member of Holdco's Board of Managers pursuant to such right of appointment, which appointment also served to appoint Overbay as manager and/or director of Holdco's subsidiaries, including but not limited to manager and member of the Board of Managers of Apex Parks and director of TZEW Corp.

d.  Defendant JOHN MALLOY ("Malloy") is an individual who, at all or certain times material hereto, held the titles or positions of manager, member of the board of managers, director, officer, and/or vice president of all or certain of the Debtors, including but not necessarily limited to serving as manager and

member of the Board of Managers of Holdco, manager and/or director of Holdco's subsidiaries, including but not limited to manager and member of the Board of Managers of Apex Parks and director of TZEW Corp., and vice president of all or certain of the Debtors, and was otherwise acting within the scope of his duties as a manager, officer, director, and/or control person of the Debtors. As a result of the positions and titles he held and duties he performed, Malloy had or should have had an intimate knowledge and understanding of, and was or should have been materially involved in and with, all material financial, operational, regulatory, accounting, and/or business related affairs and functions of the Debtors.  In addition, at all or certain times material hereto, Malloy was an owner, officer, director, manager, and/or control person of The Edgewater Funds which, along with its affiliated business entities, Edgewater Growth Capital Partners III, L.P. and Edgewater Growth Capital Partners III Co-Invest Fund, L.P., directly and/or indirectly owned material membership unit interests in the Debtors with the right to appoint two members to Holdco's Board of Managers when comprised of four members at certain times material hereto, the right to appoint two members and one additional member jointly with The Carlyle Group, and/or their affiliated business entities, BroadSky Partners LLC, BSP Partners I, L.P., and TTZ Cap Partners LLC when comprised of five members at certain times material hereto, and upon information and belief the right to appoint two members and two additional members jointly with The Carlyle Group, and/or their affiliated business entities, BroadSky Partners LLC, BSP Partners I, L.P., and TTZ Cap Partners LLC when comprised of six members at certain times material hereto. Malloy

was appointed as member of Holdco's Board of Managers pursuant to such right of appointment, which appointment also served to appoint Malloy as manager and/or director of Holdco's subsidiaries, including but not limited to manager and member of the Board of Managers of Apex Parks and director of TZEW Corp.

e.   Defendant JEFFREY FRIENT ("Frient") is an individual who, at all or certain times material hereto, held the titles or positions of manager, member of the board of managers, director, officer, and/or vice president of all or certain of the Debtors, including but not necessarily limited to serving as manager and member of the Board of Managers of Holdco, manager and/or director of Holdco's subsidiaries, including but not limited to manager and member of the Board of Managers of Apex Parks and director of TZEW Corp., and vice president of all or certain of the Debtors, and was otherwise acting within the scope of his duties as a manager, officer, director, and/or control person of the Debtors. As a result of the positions and titles he held and duties he performed, Frient had or should have had an intimate knowledge and understanding of, and was or should have been materially involved in and with, all material financial, operational, regulatory, accounting, and/or business related affairs and functions of the Debtors.  In addition, at all or certain times material hereto, Frient was an owner, officer, director, manager, and/or control person of The Edgewater Funds which, along with its affiliated business entities, Edgewater Growth Capital Partners III, L.P. and Edgewater Growth Capital Partners III Co-Invest Fund, L.P., directly and/or indirectly owned material membership unit interests in the Debtors with the right to appoint two members to Holdco's

Board of Managers when comprised of four members at certain times material hereto, the right to appoint two members and one additional member jointly with The Carlyle Group, and/or their affiliated business entities, BroadSky Partners LLC, BSP Partners I, L.P., and TTZ Cap Partners LLC when comprised of five members at certain times material hereto, and upon information and belief the right to appoint two members and two additional members jointly with The Carlyle Group, and/or their affiliated business entities, BroadSky Partners LLC, BSP Partners I, L.P., and TTZ Cap Partners LLC when comprised of six members at certain times material hereto. Frient was appointed as member of Holdco's Board of Managers pursuant to such right of appointment, which appointment also served to appoint Frient as manager and/or director of Holdco's subsidiaries, including but not limited to manager and member of the Board of Managers of Apex Parks and director of TZEW Corp.

f.   Defendant DAVID TOLMIE ("Tolmie") is an individual who, at all or certain times material hereto, held the titles or positions of manager, member of the board of managers, director, officer, and/or vice president of all or certain of the Debtors, including but not necessarily limited to serving as manager and member of the Board of Managers of Holdco, manager and/or director of Holdco's subsidiaries, including but not limited to manager and member of the Board of Managers of Apex Parks and director of TZEW Corp., and vice president of all or certain of the Debtors, and was otherwise acting within the scope of his duties as a manager, officer, director, and/or control person of the Debtors. As a result of the positions and titles he held and duties he performed,

Tolmie had or should have had an intimate knowledge and understanding of, and was or should have been materially involved in and with, all material financial, operational, regulatory, accounting, and/or business related affairs and functions of the Debtors.  In addition, at all or certain times material hereto, Tolmie was an owner, officer, director, manager, and/or control person of The Edgewater Funds which, along with its affiliated business entities, Edgewater Growth Capital Partners III, L.P. and Edgewater Growth Capital Partners III Co-Invest Fund, L.P., directly and/or indirectly owned material membership unit interests in the Debtors with the right to appoint two members to Holdco's Board of Managers when comprised of four members at certain times material hereto, the right to appoint two members and one additional member jointly with The Carlyle Group, and/or their affiliated business entities, BroadSky Partners LLC, BSP Partners I, L.P., and TTZ Cap Partners LLC when comprised of five members at certain times material hereto, and upon information and belief the right to appoint two members and two additional members jointly with The Carlyle Group, and/or their affiliated business entities, BroadSky Partners LLC, BSP Partners I, L.P., and TTZ Cap Partners LLC when comprised of six members at certain times material hereto. Tolmie was appointed as member of Holdco's Board of Managers pursuant to such right of appointment, which appointment also served to appoint Tolmie as manager and/or director of Holdco's subsidiaries, including but not limited to manager and member of the Board of Managers of Apex Parks and director of TZEW Corp.

g.  Defendant MICHAEL SHORT is an individual who, at all or certain times

material hereto, held the titles or positions of chairman, manager, member of the board of managers and/or director of all or certain of the Debtors, including but not necessarily limited to serving as chairman, manager, and/or member of the Board of Managers of Holdco, manager and/or director of Holdco's subsidiaries, including but not limited to manager and member of the Board of Managers of Apex Parks and director of TZEW Corp., and was otherwise acting within the scope of his duties as a manager, director, and/or control person of the Debtors. As a result of the positions and titles he held and duties he performed, Short had or should have had an intimate knowledge and understanding of, and was or should have been materially involved in and with, all material financial, operational, regulatory, accounting, and/or business related affairs and functions of the Debtors. Upon information and belief, Short was appointed to Holdco's Board of Managers jointly by The Edgewater Funds along with its affiliated business entities, Edgewater Growth Capital Partners III, L.P. and Edgewater Growth Capital Partners III Co-Invest Fund, L.P., and The Carlyle Group, and/or their affiliated business entities, BroadSky Partners LLC, BSP Partners I, L.P., and TTZ Cap Partners LLC, which appointment also served to appoint Short as manager and/or director of Holdco's subsidiaries, including but not limited to manager and member of the Board of Managers of Apex Parks and director of TZEW Corp.

h. Defendant JEFFREY DANE is an individual who, at all or certain times material hereto, held the titles or positions of manager, member of the board of managers and/or director of all or certain of the Debtors, including but not necessarily limited to serving as manager and member of the Board of

Managers of Holdco, manager and/or director of Holdco's subsidiaries, including but not limited to manager and member of the Board of Managers of Apex Parks and director of TZEW Corp., and was otherwise acting within the scope of his duties as a manager, director, and/or control person of the Debtors. As a result of the positions and titles he held and duties he performed, Dane had or should have had an intimate knowledge and understanding of, and was or should have been materially involved in and with, all material financial, operational, regulatory, accounting, and/or business related affairs and functions of the Debtors. Upon information and belief, Dane was appointed to Holdco's Board of Managers jointly by The Edgewater Funds along with its affiliated business entities, Edgewater Growth Capital Partners III, L.P. and Edgewater Growth Capital Partners III Co-Invest Fund, L.P., and The Carlyle Group, and/or their affiliated business entities, BroadSky Partners LLC, BSP Partners I, L.P., and TTZ Cap Partners LLC, which appointment also served to appoint Dane as manager and/or director of Holdco's subsidiaries, including but not limited to manager and member of the Board of Managers of Apex Parks and director of TZEW Corp.

8.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334.

9.    This is a non-core and core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (E), and (O).

10.    Plaintiff consents to the entry of final orders and judgment by the Bankruptcy Court in accordance with Fed. R. Bankr. P. 7008(a) and Local Rule 7008-1, subject to Plaintiff's demand for and right to a trial by jury before the District Court as in set forth in Paragraph 100 below.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1409.

12. All conditions precedent to the filing of this action have been performed, waived, satisfied, or have otherwise occurred.

## MATERIAL NON-PARTIES TO THIS ACTION

13. The material non-parties to this action referenced in this Complaint are: (i) The Carlyle Group, a private equity firm, along with its affiliated business entities including BroadSky Partners LLC, BSP Partners I, L.P., and TTZ Cap Partners LLC (sometimes collectively referred to herein as "Carlyle/BroadSky") and (ii) The Edgewater Funds, a private equity firm, along with its affiliated business entities including Edgewater Growth Capital Partners III, L.P. and Edgewater Growth Capital Partners III Co-Invest Fund, L.P. (sometimes collectively referred to herein as "Edgewater").

14. At all or certain times material hereto, Carlyle/BroadSky and Edgewater each appointed two members of the Debtors' respective boards of managers and directors when comprised of four members, appointed two members each and one additional member jointly to the Debtors' respective boards of managers and directors when comprised of five members, and upon information and belief appointed two members each and two additional members jointly to the Debtors' respective boards of managers and directors when comprised of six members. At all or certain times material hereto, and in breach and/or abdication of their respective fiduciary duties of loyalty, good faith, and care to the Debtors, the Defendants improperly allowed Carlyle/BroadSky and Edgewater to exercise improper dominance and control of and over the Company and Defendants, and/or otherwise acted or failed to act in furtherance of the interests of such entities rather than in the best interests of and to the detriment of the Debtors, to which they owed their fiduciary duties.

## FACTS COMMON TO ALL CLAIMS

### A.  Introduction & Preliminary Statement

15.     The breach of fiduciary duty claims at issue involve acts and omissions that primarily fall into the following categories – (i) claims against the Defendants for complete and utter failure to implement and/or follow adequate systems, safeguards, and controls, or to otherwise fully and properly monitor or supervise the Company's operations, i.e., liability premised on "unconsidered inaction," as opposed to affirmative decisions to act or not act, in regard to multiple material business, financial, and operational functions of the Company; and (ii) claims against the Defendants for (a) causing, participating, allowing, or otherwise acquiescing in certain improper acts and omissions, failing to prevent same, and improperly failing to disclose same, (b) causing, allowing, or otherwise acquiescing in the dissemination of materially inaccurate business, financial, and operational information to the Company's secured lenders and/or other third parties and/or otherwise failing to disclose certain material negative information about the Debtors, (c) failing to properly, fully, and timely consider options and effectuate an action plan to maximize the value of the Company, (d) acting or failing to act in conscious disregard for their respective fiduciary duties and the best interests of the Company, and (e) acting or failing to act to advance a purpose other than the best interests of the Company.

16.     The Defendants' respective breaches of their fiduciary duties of loyalty, good faith, and care, among other things, (i) caused the Company to engage in corporate waste and incur debt in excess of $20 million, (ii) caused the Company's assets to be depleted or otherwise materially decreased in value, and (iii) caused the Company to suppress from scrutiny by its secured lenders and other third parties the true, critically impaired and defective business, financial, regulatory, and operational condition of the Company, all of which allowed the Company to continue to operate well past the point of insolvency resulting in substantial harm and damage to the Company.

17.     As a direct and proximate result of the acts and omissions committed by the Defendants in breach of their respective fiduciary duties of loyalty, good faith, and care alleged herein, the Debtors have suffered damages that include, but that are not necessarily limited to: (i) the loss and depletion of valuable assets of the Debtors; (ii) increased liabilities of the Debtors; (iii) the decrease in the asset values and enterprise value of the Debtors; (iv) the increased insolvency of the Debtors; (v) administrative fees and expenses incurred by the Estate during the bankruptcy proceedings related to mitigating and/or rectifying the acts and omissions of the Defendants, and claims filed or asserted against the Estate in respect thereof; and (vi) the value of all avoidable transfers pursuant to Chapter 5 of the Bankruptcy Code or under Texas, California, New York, Delaware and/or other applicable state law.

**B.  <u>Background on the Debtors</u>**

18.     The Debtors consist of six limited liability companies and one corporation formed in Delaware and Texas, as applicable.  The below chart depicts the Debtors' corporate structure as of the Petition Date:



19.    Prior to the Petition Date, the Debtors operated as a privately held owner-operator of amusement parks, resorts, and family entertainment centers with locations around the country, including Texas, California, New Jersey, Florida, Indiana, and New York.

20.    The Company was founded in 2014 by affiliates of private equity firms The Edgewater Funds, Broad Sky Partners, and The Carlyle Group, through the acquisition of 14 amusement parks, resorts, and family entertainment centers across the country from Palace Entertainment, which at that time was one of the largest operators of waterparks and family entertainment centers in the United States.

21.    The family entertainment centers included park locations under the Boomers!, Malibu Grand Prix, Mountasia, and SpeedZone franchise brands with locations that provided affordable family fun close to home by offering a range of rides, attractions, and events.

22.    In the years leading up to the Petition Date, the Debtors employed more than 1,100 employees, including approximately 100 full-time employees and 1,000 part-time employees, each supplemented by seasonal staff with set termination dates to bolster the workforce during the busy seasons. By the  Petition Date, the Debtors employed approximately 50 full-time employees.

23.    Prior to the Petition Date, the Debtors leased all of their park locations and corporate offices for an aggregate occupancy cost of approximately $1,000,000 per month.

24.    During the Chapter 11, the Debtors' estimated that the go-forward costs for parks would be approximately $700,000 per month in rent and associated expenses, which figure assumed the rejection of leases for four closing parks effective as of the Petition Date, providing the Company with savings of approximately $300,000 per month in rent and associated expenses.

25.    In November 2016, the Company's CEO, Al Weber, Jr. ("Weber"), passed away unexpectedly. The Debtors claim that Weber led the Company's investment and expansion strategy since its founding in 2014.

26.    The Debtors' respective boards of managers or directors initially consisted of four members, which was increased to five members in 2018, and upon information and belief, six members sometime thereafter, including two representatives of Carlyle/BroadSky at all times, two representatives of Edgewater at all times, one independent manager/director appointed by Carlyle and Edgewater when the boards consisted of five members, and upon information and belief two independent managers/directors appointed by Carlyle and Edgewater when the boards consisted of six members.

27.    On or about December 2, 2019, Debtor Apex Parks Group, LLC appointed Scott Avila of Paladin Management Group, LLC as the Company's chief restructuring officer (the "CRO").

28.    In his first day declaration, the CRO identified a "confluence of factors" that contributed to the need to file the chapter 11 cases, which included:

> (a) increased industry competition-most significantly, the consolidation of theme parks by large corporations in major markets-which has led to a decrease in foot traffic and sales, causing a number of small and middle market theme parks to close in recent years; (b) heavy operational expenditure requirements to maintain and improve operations, particularly amidst the need to install new rides and attractions due to increased competition; (c) seasonal business challenges, including both the inability to operate locations year-round and dependence on fair weather when parks are operational; (d) general litigation that has created expense, distraction, and, in some cases, generated negative press for the Company; and (e) management turnover due to the unexpected death of former CEO Al Weber, Jr. in 2016. Over time, these factors have rendered the Debtors' business operations significantly cash-flow negative, complicating their relationships with lenders, landlords, and vendors, among other stakeholders.

29.    Notably, each of the above factors pre-dated the early 2020 COVID-19 outbreak.

30.    The Holdco Debtor's bankruptcy schedules filed with the Court reflected assets valued at $55,257,990.79, with unpaid liabilities totaling $86,277,197.68.

31.    Defendants caused, allowed, or otherwise acquiesced in the Company's failure to pay taxes to governmental taxing agencies and authorities, which resulted in the filing of

approximately $3.5 million of claims against the Estate for unpaid taxes (the "Unpaid Tax Liabilities"), resulting in an artificial inflation of the Debtors' reported net revenues and a material increase in non-tax related liabilities.

## C. The Acquisitions, Re-brandings, and Park Renovations

32.     Between March 2015 and May 2016, the Defendants caused the Company to engage in a costly, aggressive acquisition strategy, while rebranding and materially renovating certain venues (the "Improvident Acquisitions and Renovations"), including:

a.  In March 2015, the Company initiated its investment and growth strategy, announcing the largest renovation in the history of the Boomers! Boca Raton location, adding arcade games, go karts, bumper cars, and a sports bar.

b.  In April 2015, the Company announced the acquisition of Sahara Sam's Oasis Indoor and Outdoor Water Park in West Berlin, New Jersey, the country's only free-standing, year-round, indoor-outdoor water park, which marked the Company's first expansion beyond its initial fourteen locations. The park offered year-round family entertainment.

c.  In May 2015, the Company rebranded the Houston Mountasia Family Fun Center as Boomers! Houston, the first Boomers! location in Texas, featuring go karts, bumper boats, miniature golf, arcade, and a brand new sports bar. The Company also implemented a strategic pricing initiative, offering free admission to give guests the freedom to decide how long to stay and how much to pay. Investment continued in July 2015 at Big Kahuna's Water & Adventure Park, where the Company installed the Kowabunga Racer water slide, the largest single investment in a new ride at the location since 2008.

d.  In September 2015, the Company purchased Indiana Beach Amusement Resort

("Indiana Beach"), the second significant addition to the Company's park portfolio in less than a year. Indiana Beach, located in Monticello, Indiana, was a 90-year-old park with a broad range of attractions, including one of the top wooden roller coasters and steepest drop steel roller coasters in North America.  In February 2016, the Company announced that Indiana Beach would undergo a transformation, including the renovation of numerous rides and facilities and the addition of a campground.

    e.    In May 2016, the Company announced the last addition to its park portfolio with the acquisition of Martin's Fantasy Island theme park in Grand Island, New York.

33.    The acquisitions and renovations burdened the Company with multiple over market leases, with insufficient cash flow to service, *inter alia*, long term debt and lease obligations.

34.    Regarding renovations, upon inspection of the multi-million dollars of purported renovations made to Indiana Beach post-acquisition, the Debtors' secured lenders had reason to believe that a material portion of the funds earmarked for the project were wasted, misappropriated, or otherwise became the subject of corporate waste, as the park appeared to have no material change in its appearance or condition upon completion of the process.

**D.  <u>The Park Closures</u>**

35.    Between August 2015 through the Petition Date, the Debtors closed multiple locations, including the following:

    f.    In August 2015, the Company announced that it would be closing the Malibu Grand Prix and Castle in San Antonio, Texas due to the park's underperformance.

    g.    In September 2017, the Company announced that it would be closing Boomers ! Fresno due to the landlord's purported unwillingness to extend the lease following failed negotiations. The Company had invested over half a million dollars in

renovations at the location in 2016 alone.

    h.  In February 2020, the Company announced that it would be closing the following underperforming parks: (i) Indiana Beach; (ii) Fantasy Island; (iii) Boomers! Houston; and (iv) Dallas SpeedZone

### E.  Long Term Debt and Trade Creditor Liabilities

36.    As of the Petition Date, the Debtors' capital structure consisted of outstanding funded-debt obligations in the aggregate principal amount of approximately $79 million, including the Revolving Credit Facilities and the Term Loan (defined below). The following table summarizes the Debtors' outstanding funded-debt obligations as of the Petition Date:

| Funded Debt | Facility | Principal Amount Outstanding |
|---|---|---|
| Revolving Credit Facilities | Revolving Credit A-1 Commitment | $6.8 million |
| | Revolving Credit A Commitment | $10 million |
| | Revolving Credit B Commitment | $8.5 million |
| Term Loan | Term Loan Facility | $53.65 million |
| TOTAL | | $79 million |

37.    Various Debtor entities (excluding Holdco) are parties to that certain amended and restated financing agreement, dated as of September 18, 2014 (the "Financing Agreement"), by and among Apex Parks Group, LLC, as borrower, its parent and four of its subsidiaries as guarantors (collectively, the "Loan Parties"), Cerberus Business Finance, LLC, as administrative and collateral agent (the "Prepetition Agent"), and eighteen lender entities, all affiliated with the Prepetition Agent (collectively, the "Secured Lenders").

38.    The Financing Agreement provided the Debtors with three revolving credit facilities and a term Loan. The Secured Lenders' collateral under the Financing Agreement

consisted of substantially all property, assets, and interests of the Loan Parties.

39.    The Financing Agreement included three revolving credit commitments: (i) that certain revolving credit commitment pursuant to the sixth amendment to the Financing Agreement dated as of December 2, 2019; (ii) that certain revolving credit commitment pursuant to the fifth amendment to the Financing Agreement dated as of January 17, 2019; and (ii) that certain revolving credit commitment pursuant to the original Financing Agreement dated as of September 18, 2014 (collectively, the "Revolving Credit Facilities"). Together, the Revolving Credit Facilities outstanding as of the Petition Date totaled $25,263,287.

40.    The Financing Agreement also included a term loan (the "Term Loan"), which provided a total credit commitment of $53,647,000, all of which was outstanding as of the Petition Date.

41.    With the Debtors having been perpetually distressed, constantly facing liquidity crunches, and rapidly-approaching maturities under their prepetition credit facility, the Debtors and the Secured Lenders entered into six amendments to their prepetition credit agreement between April 2015 and December 2019, followed by two in January 2020, and two more in February 2020. Then following the rise of COVID-19, one more in each of March and April 2020.

42.    As of the Petition Date, the Debtors disclosed at least $6.8 million in outstanding claims owed to its various vendors, suppliers, and service providers, including claims reflected in the Debtors' then current accounts payable or otherwise accrued and/or attributable to the period prior to the Petition Date.

**F.    The Questionable Business Practices and Pre-Bankruptcy Litigation**

43.    Prior to the Petition Date, the Company was so grossly and recklessly mismanaged and operated that, among other harm, it became a party to approximately 100 lawsuits across the country including, among others, tort claims, contract disputes, and employment disputes – all the

direct results of various acts and omissions by the Defendants relative to the operation of the parks (collectively, the "Questionable Business Practices").

44.     Many of the tort actions against the Company alleged acts and omissions that directly implicated the Company's failure to fully and properly perform maintenance on its rides, a direct result of Defendants' failure to fully or properly oversee and monitor the Company's operations, including the failure to fully or properly implement, maintain, and/or follow adequate or proper safeguards, systems, and controls to prevent and/or rectify such problems in conscious disregard for their fiduciary duties.

45.     In one personal injury lawsuit settled in October 2020 prior to the appointment of the Trustee, plaintiff's counsel posted on its website that "Defendant [Debtor] Apex Parks Group, LLC paid $1,750,000 to settle the wrongful death claim and $3,000,000 to settle the minor's injury and emotional distress claim [arising from an alleged] reckless business model that encouraged drinking by adults who should have been supervising their children [whereby] . . . they were offered specialty drinks and cocktails typical of those seen at Caribbean resorts including 'fishbowls of alcohol' despite knowing that these parents would eventually have to transport their children home."

46.     In regard to the pending litigation, in its first day declaration, the Company represented that:

> "[d]efending against these actions [was] expensive, time consuming, and, importantly, distract[ed] management from their day-to-day responsibilities to maximize operational efficacy and revenue during a period of dwindling liquidity. In addition, certain litigation has generated negative press for the Company, causing temporary reductions in park attendance and sales. While these issues are typical across theme park industry, they are particularly difficult for the Debtors given their constrained liquidity situation.

**G.  The Company's Audited Financial Statements Reflect Material Financial Distress**

47.    As part of their loan documents, the Debtors' Secured Lenders required the submission of annual audited financial statements, which contained multiple indicia of material ongoing financial distress.

48.    In 2015, the Company retained Cohn Reznick, which was later replaced by Grant Thornton, to provide audit opinions for the fiscal years 2015, 2016, 2017, and 2018 which reflected, *inter alia*, that: (i) as of December 30, 2018, the Company had federal and state net operating loss carry forwards of approximately $26,500,000 and $36,190,000, respectively, (ii) during 2015, 2016, 2017, and 2018 alone, the Company suffered net losses of $5,578,868, $7,554,543, $5,237,314, and $9,635,851, respectively, and (iii) in connection with acquired properties (a) in 2014, the Company recorded a liability for above market leases of $4,380,000, (b) in 2015, the Company recorded a liability for an above market lease of approximately $11,400,000, (c) in 2016, the Company recorded a liability for an above market lease of approximately $4,500,000, and (d) as of December 30, 2018, the net carrying balance of the above market lease obligation was $15,249,089.

49.    In addition, while the balance sheet reflected assets exceeding liabilities for 2015, 2016, 2017, and 2018, for each year the third highest value items after property and equipment were goodwill and intangibles, totaling $20,966,863 in 2015, $21,412,621 in 2016, $20,106,197 in 2017, and $21,379,735 in 2018.

**H.  The Season Pass Scam Suppresses the Company's Liquidity and Cash Flow Problems, Dissemination of Materially Inaccurate Information & Complete Failure to Implement or Follow Adequate Safeguards and Controls**

50.    Instead of effectively dealing with the Company's myriad of business, financial, regulatory, accounting, and operational deficiencies head-on, the Defendants, in bad faith and/or

gross negligence, caused the Debtors to implement a "season pass" program to suppress ongoing liquidity and cash flow problems (the "Season Pass Scam") – this, despite Defendants knowing or having reason to know that its sole purpose was to artificially inflate monthly revenues through what effectively amounted to creative accounting and financial reporting methodologies.

51.    In its audited financial statement for the years ended December 30, 2017 and December 31, 2016, the Company initially represented that it ***record[ed] purchases of season passes as deferred revenue, and recognize[d] the associated revenue ratably over the period of time for which each season pass was purchased."*** Thereafter, in its audited financial statement for the years ended December 30, 2018 and December 31, 2017 issued April 30, 2019, the Company admitted that:

> record[ed] purchases of season passes as deferred revenue and recognize[d] a pro-rata portion of the revenue as the guest attend[ed] our parks. ***We estimate a redemption rate based on historical experience and other factors and assumption we believe to be customary and reasonable. We review the estimated redemption rate regularly and on an ongoing basis and revise it as necessary throughout the year.***

(emphasis added).

52.    The approach described by management in audited financial statements was rife with mischief, as it resulted in the Defendants providing materially inflated "estimated" season pass monthly revenue and financial reporting to the Secured Lenders containing inordinately higher revenues per month, which Defendants would later "revise" at year-end to reflect actual adjusted annual revenue shortfalls totaling in the millions of dollars.

53.    Defendants, in bad faith, caused, allowed, or otherwise acquiesced in the dissemination of materially inaccurate financial reporting to the Secured Lenders, which served to underplay the true, critically impaired financial condition of the Debtors.

54.    In addition, in complete abdication and breach of their fiduciary duties of loyalty

and good faith, the Defendants failed to implement and/or follow adequate safeguards or controls to prevent such materially inaccurate financial reporting and failed to properly monitor and oversee the Company to prevent such materially inaccurate financial reporting.

55.     Such bad faith materially inaccurate financial reporting to the Secured Lenders suppressed the true, critically impaired and defective financial, business, and operational condition of the Debtors, which allowed the Debtors to continue to operate well past the point of insolvency causing substantial harm and damage to the Debtors, including but not limited to substantial increase in the Debtors' liabilities and depletion of assets and enterprise value.

56.     In addition to materially inaccurate financial reporting, the season passes attracted the unwanted attention of the New York Attorney General (the "NYAG"), which commenced an investigation of the Company after having received over 500 consumer complaints seeking refunds for goods and services purchased from Company for the 2020 season when Fantasy Island closed in February 2020.  As part of an executed settlement with the NYAG, the Company was required to work with the NYAG in processing $424,848.07 of consumer refunds arising from the season pass program.

**I.**   **The Failure to Fully, Properly, and Timely Consider Options and Effectuate an Action Plan to Maximize Value of the Company and Failure to Implement and Follow Safeguards and Controls Regarding Same**

57.     Despite years of annual operating losses caused by the Company's ongoing material business, financial, regulatory, accounting, and operational deficiencies, Defendants failed to fully, properly, and timely consider options and effectuate an action plan to maximize the value of the Company.

58.     Given the critically impaired and defective financial, business, and operational condition of the Debtors, the Defendants had an obligation to properly, fully, and timely consider options and effectuate an action plan to maximize the value of the Debtors. The Defendants failed

to do so in breach, abdication, and conscious disregard for their fiduciary duties of loyalty, good faith, and care and the best interests of the Debtors.

59.     Defendants likewise, in bad faith, failed to implement and/or follow adequate safeguards and controls to ensure proper, full, and timely consideration of options and effectuation of an action plan to maximize the value of the Debtors and failed to properly monitor and oversee the Company to ensure proper, full, and timely consideration of options and effectuation of an action plan to maximize the value of the Debtors.

60.     Instead, the Defendants caused, allowed, or otherwise acquiesced in the continued financial, business, and operational decline of the Debtors and caused or allowed the Debtors to continue to operate well past the point of insolvency, causing substantial harm and damage to the Debtors, including but not limited to substantial increase in the Debtors' liabilities and depletion of assets and enterprise value.

61.     It wasn't until February 2019 that the Debtors finally engaged the services of a New York-based investment banking firm "to pursue a broad array of potential transactions, including sales of specific parks, a sale of the entire company, or a large financing transaction," which contacted known strategic partners who might be interested in the Debtors' assets.

62.     Of those that received confidential diligence, at least six interested parties engaged in various discussions with the Debtors, including extensive discussions regarding a potential merger over a period of several months. Ultimately, all declined to proceed with a transaction, with all further marketing efforts ceasing work by November 2019.

63.     Beginning in November 2019, the Debtors finally engaged in an operational review of all of the Debtors' assets, which should have commenced years earlier, and that resulted in the decision to close four parks – Boomers!, Houston, Dallas SpeedZone, Fantasy Island, and Indiana Beach, which occurred.

**J.    The Chapter 11 Asset Sales, Lease Rejections, and Abandonments**

64.    On April 8, 2020, the Debtors consummated the sale of Indiana Beach and all personal property remaining at the park. Pursuant to the terms of the sale, the buyer also agreed to assume certain obligations to the Indiana Beach customers (including season passes and existing deposits).

65.    In conjunction with Indiana Beach sale, the Debtors filed a motion seeking authority to reject the existing leases of Boomers! Houston, Dallas SpeedZone, Fantasy Island, and Indiana Beach effective as of the Petition Date and abandon any personal property remaining at these locations, which was granted.

66.    On April 12, 2020, an affiliate of the Secured Lenders, APX Acquisition Company LLC ("APX"), as stalking horse credit bidder, executed an asset purchase agreement with the Debtors with a final purchase price, following multiple amendments, of $60,000,000.  Despite extensive marketing efforts, no other bidders participated in the process.

67.    By Order dated June 4, 2020, the Bankruptcy Court approved the sale to APX, which sale closed shortly thereafter.

**K.    The Improper Carlyle/BroadSky and Edgewater Payments and Failure to Implement and Follow Safeguards and Controls to Prevent Same**

68.    Upon information and belief, the Defendants caused or allowed the Company to make multiple improper or questionable payments to Edgewater and Carlyle/BroadSky for less than reasonably equivalent value, while the Debtors were insolvent and/or otherwise unable to pay their debts as such debts matured, and/or with an actual intent to hinder or delay creditors, including, upon information and belief, payments exceeding $2.6 million ("Improper Payments"), with such Improper Payments also constituting corporate waste.

69.    Among other badges reflecting an intent to hinder or delay creditors, the Improper

Payments were made while the Debtors were balance sheet and/or equitably insolvent, to insiders, and/or for less than reasonably equivalent value.

70.    Defendants likewise, in bad faith, failed to implement and/or follow adequate safeguards and controls to prevent such Improper Payments and failed to properly monitor and oversee the Company to prevent such Improper Payments.

**L.  The Claims Against and Damage to the Estate**

71.    Per the proof of claim registers maintained by the Chapter 11 claims agent and Clerk of the Court, in excess of $20 million of claims have been filed against the Chapter 7 and 11 estates, exclusive of the $18.9 million deficiency claim of the Secured Lenders, and a $25 million unliquidated claim of a personal injury claimant.

72.    As a direct and proximate result of the acts and omissions committed by the Defendants in breach of their respective fiduciary duties of loyalty, good faith, and care alleged herein, the Debtors have suffered damages that include, but that are not necessarily limited to: (i) the loss and depletion of valuable assets of the Debtors; (ii) increased liabilities of the Debtors; (iii) the decrease in the asset values and enterprise value of the Debtors; (iv) the increased insolvency of the Debtors; (v) administrative fees and expenses incurred by the Estate during the bankruptcy proceedings related to mitigating and/or rectifying the acts and omissions of the Defendants, and claims filed or asserted against the Estate in respect thereof; (vi) corporate waste; (vii) the value of all Improper Payments; (viii) and the value of all avoidable transfers pursuant to Chapter 5 of the Bankruptcy Code or under Texas, California, New York, or Delaware or other applicable state law, including the Improper Payments; and (ix) other damages as may be ascertained though discovery.

**M. Insolvency**

73.    At all times material hereto, the Debtors: (i) were insolvent; (ii) intended to incur,

or believed that they would incur, debts that would be beyond their ability to pay as such debts matured; and/or (iii) were generally not paying debts as they become due.

**N.  Conditions Precedent**

74.    All conditions precedent to the filing of this action have been waived, satisfied, excused, performed, or have occurred.

**Count I**
**BREACH OF FIDUCIARY DUTY AGAINST ZACHEM,**
**BASTO, OVERBAY, MALLOY, FRIENT, AND TOLMIE**
**(The Dual Capacity Defendants)**

The Trustee sues Defendants Zachem, Basto, Overbay, Malloy, Frient, and Tolmie (collectively, the "Dual Capacity Defendants") and alleges:

75.    The Trustee realleges paragraphs 1 through 74 above.

76.    This is a claim under Delaware, Texas, and/or other applicable statutory and common law, by the Trustee, in his capacity as the duly appointed and acting Trustee of and for the Estate of the Debtors, against the Dual Capacity Defendants for breach of their fiduciary duties of loyalty, good faith, and care based upon their acts and omissions as managers, officers, directors, and/or control persons of the Debtors.

77.    At all or certain times material hereto, the Dual Capacity Defendants served in dual roles and capacities as (1) managers/directors and (2) officers of the Company and, as such, owed the Company a fiduciary duty to discharge their duties in good faith, with the care an ordinarily prudent manager, director, or officer in a like position would exercise, and in a manner reasonably believed to be in the best interests of the Company.

78.    Specifically, the duty of loyalty and good faith under Delaware and Texas law required the Dual Capacity Defendants to put the interests of the Company above their own interests and those of others, and was not limited to disloyalty in the classic sense, i.e. self-dealing,

personal gain, or a cognizable conflict of interest. In addition, in discharging their duty of loyalty and good faith, the Dual Capacity Defendants were required to act in good faith, and would be in breach of the duty of loyalty by acting with a purpose other than that of advancing the best interests of the Company, by acting in violation of applicable positive law, or by failing to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities. The Dual Capacity Defendants were also required to ensure that they did not display a lack of diligence that was more culpable than simple inattention or failure to be informed of all facts material to their decisions, such that it was qualitatively more culpable than gross negligence.

79.     Further, in discharging their duties of loyalty and good faith, managers, directors, officers, and control persons are required to monitor operations, and the failure to do so results in liability premised upon "unconsidered inaction," as opposed to affirmative decisions to act or not act. The duty to monitor includes the ability to assure that information and reporting systems exist in the organization that are reasonably designed to provide timely, accurate information sufficient to allow managers, directors, officers, and control persons, each within their scope, to reach informed judgments concerning both compliance with law and business performance.

80.     A sustained or systematic failure to exercise oversight – such as an utter failure to assure that a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability. Thus, "oversight" liability is characterized by a lack of good faith.

81.     The necessary conditions predicate for oversight liability include: (a) the managers, directors, officers, and/or control persons utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that

the managers, directors, officers, and/or control persons knew that they were not discharging their fiduciary obligations. Where managers, directors, officers, and/or control persons fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

82.     Additionally, the duty to exercise due care under Delaware and Texas law required the Dual Capacity Defendants to use that amount of care which ordinarily careful and prudent men would use in similar circumstances and to consider all material information reasonably available. In exercising the duty of due care, the Dual Capacity Defendants could not engage in acts or omissions on behalf of the Company that resulted in a loss to such entity arising from decisions that: (i) were ill-advised, uninformed or that failed to consider material information; (ii) constituted an unconsidered failure to act in circumstances in which due attention would, arguably, have prevented the loss; (iii) were based upon an unintelligent or unadvised judgment; (iv) were grossly negligent, such as engaging in an irrational decision making process signifying more than ordinary inadvertence or inattention; or (v) resulted in a corporate strategy that reflected an indifference to the potential risk of harm to the Company, such that reasonable businesspersons would have carefully considered the obvious negative consequences. Moreover, under Delaware and Texas law, the more significant the subject matter of the decision, the greater is the requirement to probe and consider alternatives. To further satisfy the duty of due care, a reasonable and informed deliberative process was required by attending meetings, asking questions, reviewing written materials, and otherwise becoming informed of relevant information reasonably available, and to seek the input of experts, such as investment bankers, attorneys, and accountants.

83.     In regard to the facts alleged above involving the Company's flagrant business, operational, financial, and compliance deficiencies, and lacking good faith, the Dual Capacity Defendants exhibited a knowing, conscious, and reckless disregard for the best interests of the

Company and, except for their knowing, conscious, and reckless disregard of the facts, they should have known of the risk of damage that ultimately befell the Company.

84.     Specifically, the Dual Capacity Defendants engaged in breaches and abdication of, and conscious disregard for, their fiduciary duties of loyalty, good faith, and care owed to the Company, with breaches that include, but that may not necessarily be limited to:

    (a)  causing, acquiescing in, or otherwise allowing the Company to engage in the Improvident Acquisitions and Renovations;

    (b)  failing to prevent corporate waste in connection with the Improvident Acquisitions and Renovations;

    (c)  failing to implement and/or follow adequate safeguards and controls to ensure reasonably informed decisions regarding the Improvident Acquisitions and Renovations and prevent corporate waste in connection with the Improvident Acquisitions and Renovations;

    (d)  failing to fully and properly monitor and oversee the Company in connection with the Improvident Acquisitions and Renovations and to prevent corporate waste in connection with the Improvident Acquisitions and Renovations;

    (e)  causing, acquiescing in, or otherwise allowing the Company to engage in the Questionable Business Practices;

    (f)  failing to implement and/or follow adequate safeguards and controls to prevent or rectify the Questionable Business Practices;

    (g)  failing to fully and properly monitor and oversee the Company to prevent or rectify the Questionable Business Practices;

    (h)  causing, acquiescing in, or otherwise allowing the Company to engage in the Season Pass Scam;

(i)   failing to implement and/or follow adequate safeguards and controls to prevent the Season Pass Scam;

(j)   failing to fully and properly monitor and oversee the Company to prevent the Season Pass Scam;

(k)   causing, acquiescing in, or otherwise allowing the Company to provide materially inaccurate financial information to Secured Lenders and/or other third parties;

(l)   failing to implement and/or follow adequate safeguards and controls to prevent providing of materially inaccurate financial information to Secured Lenders and/or other third parties;

(m)   failing to fully and properly monitor and oversee the Company to prevent providing of materially inaccurate financial information to Secured Lenders and/or other third parties;

(n)   failing to fully, properly, and timely consider options and effectuate an action plan to maximize value of the Debtors;

(o)   failing to implement and/or follow adequate safeguards and controls to ensure full, proper, and timely consideration of options and effectuation of an action plan to maximize value of Debtors;

(p)   failing to fully and properly monitor and oversee the Company to ensure full, proper, and timely consideration of options and effectuation of an action plan to maximize value of Debtors;

(q)   causing, acquiescing in, or otherwise allowing the Improper Payments;

(r)   failing to implement and/or follow adequate safeguards and controls to prevent the Improper Payments;

34

(s)   failing to fully and properly monitor and oversee the Company to prevent the Improper Payments;

(t)   causing, acquiescing in, or otherwise allowing the Company's failure to pay the Unpaid Tax Liabilities, thereby suppressing the true, critically impaired and defective business, financial, and operational condition of the Debtors;

(u)   causing, acquiescing in, or otherwise allowing the Company's failure to disclose to the Secured Lenders and other third parties the accrual and existence of Unpaid Tax Liabilities, thereby suppressing the true, critically impaired and defective business, financial, and operational condition of the Debtors;

(v)   causing, allowing, or otherwise acquiescing in the Company's failure to ensure that all necessary and proper safeguards, measures, controls, and actions were employed and/or otherwise undertaken in respect of park operations and making tax payments;

(w)   failing to ensure that sufficient and adequate safeguards or controls were implemented and/or otherwise followed in regard to the business, financial, regulatory, accounting and operational affairs and functions of the Debtors, including park operations and making tax payments;

(x)   failing to fully or properly monitor, oversee, and supervise the financial, operational, regulatory, accounting and business affairs and functions of the Debtors, including as to park operations and tax payments;

(y)   failing to undertake in earnest sale and marketing efforts prior to 2019, despite multiple years of sustained, material operating losses and other material factors supporting an earlier sale process which, but for the lack of adequate

35

safeguards and controls, would have been implemented sooner;

(z) causing, allowing, or otherwise acquiescing in the Company's failure to file or consider filing a bankruptcy or other insolvency proceeding sooner, which would have prevented the accrual of millions of dollars of unpaid tax liabilities, trade debt, and other liabilities;

(aa) causing, allowing, or otherwise acquiescing in the dissemination of materially inaccurate business, financial, operational, and regulatory information to the Secured Lenders and/or other third parties;

(bb) failing to implement and/or follow adequate safeguards or controls in regard to the Company's financial reporting, bookkeeping, regulatory, legal, operational, compliance, business, and accounting functions, which enabled the dissemination of materially inaccurate information, as well as disabling a reasonably informed decision making process in respect of, *inter alia*, the appropriate time to file a bankruptcy or other insolvency proceeding or engage in a sale process prior to 2019;

(cc) in connection with causing, allowing, or otherwise acquiescing in the bad faith dissemination of materially inaccurate business, financial, and operational information, suppressing the true, critically impaired and defective financial, business, and operational condition of the Debtors;

(dd) causing, allowing, or otherwise acquiescing in the continued business, financial, and operational decline of the Debtors and causing or allowing the Debtors to continue to operate well past the point of insolvency, causing substantial harm and damage to the Debtors, including but not limited to substantial increase in the Debtor's liabilities and depletion of assets and

enterprise value;

(ee) failing to implement safeguards and controls in regard to material business, operational, and financial functions;

(ff) failing to follow safeguards and controls in regard to material business, operational, and financial functions;

(gg) failing to ensure that business, operational, and financial information was being fully, properly, and accurately reported;

(hh) failing to implement or monitor safeguards and controls to prevent corporate waste;

(ii) failing to fully or properly monitor, oversee, and supervise the Company and its business, operational, and financial functions;

(jj) acting or failing to act in conscious disregard for their fiduciary duties and best interests of the Debtors;

(kk) causing, allowing, or otherwise failing to prevent suppression of the true, critically impaired and defective business, financial, and operational condition of the Debtors;

(ll) failing to properly perform, assist, and engage in all aspects of the Company's business and operations in conscious disregard for their fiduciary duties and best interests of the Debtors;

(mm) permitting the Company to engage in corporate waste;

(nn) permitting the Company to engage in certain avoidable transfers and make certain improper payments;

(oo) failing to fully or adequately inform themselves in regard to material business, operational, and financial decisions and functions affecting the Company,

thereby disabling themselves from making reasonably informed decisions; and (pp) other breaches and proximately caused damages as may be ascertained through discovery.

85.     The Dual Capacity Defendants knew that their acts and omissions as described herein were in breach, abdication, and/or conscious disregard of their respective responsibilities, respective fiduciary duties of loyalty, good faith, and care, and the best interests of the Debtors, and as a result, breached their duty of loyalty by failing to discharge such fiduciary obligations in good faith.

86.     Each of the above breaches adversely impacted and conferred no benefit to the Company, and as a direct and proximate result of same, caused damage to the Company consisting of, *inter alia*: (i) the loss and depletion of valuable assets of the Debtors; (ii) increased liabilities of the Debtors; (iii) the decrease in the asset values and enterprise value of the Debtors; (iv) the increased insolvency of the Debtors; (v) administrative fees and expenses incurred by the Estate during the bankruptcy proceedings related to mitigating and/or rectifying the acts and omissions of the Defendants, and claims filed or asserted against the Estate in respect thereof; (vi) corporate waste; (vii) the value of all Improper Payments and the value of all avoidable transfers pursuant to Chapter 5 of the Bankruptcy Code or under Texas, California, New York, Delaware, or other applicable state law; and (viii) other damages as may be ascertained though discovery.

WHEREFORE, the Trustee demands the entry of judgment against the Dual Capacity Defendants for compensatory damages, consequential damages, and special damages including, but not limited to: (i) the loss and depletion of valuable assets of the Debtors; (ii) increased liabilities of the Debtors; (iii) the decrease in the asset values and enterprise value of the Debtors; (iv) the increased insolvency of the Debtors; (v) administrative fees and expenses incurred by the Estate during the bankruptcy proceedings related to mitigating and/or rectifying the acts and

omissions of the Defendants, and claims filed or asserted against the Estate in respect thereof; (vi) corporate waste; (vii) the value of all Improper Payments; (viii) the value of all avoidable transfers pursuant to Chapter 5 of the Bankruptcy Code and under Texas, California, New York, Delaware, or other applicable state law; (ix) pursuant to the faithless servant doctrine and application of Section 542(a) of the Bankruptcy Code and/or other applicable law, the disgorgement and turnover of all compensation, salaries, stipends, bonuses, fees, and any and all other payments and benefits paid to Defendants pursuant to; and (x) other damages as may be ascertained though discovery, plus pre-judgment and post-judgment interest, costs and for any other relief the Court deems appropriate.

**Count II**
**BREACH OF FIDUCIARY DUTY**
**AGAINST SHORT AND DANE**
**(The Manager/Director Defendants)**

The Trustee sues Defendants Short and Dane (collectively, the "Manager/Director Defendants") and alleges:

87.    The Trustee realleges paragraphs 1 through 86 above.

88.    This is a claim under Delaware, Texas, and/or other applicable statutory and common law, by the Trustee, in his capacity as the duly appointed and acting Trustee of and for the Estate of the Debtors, against the Manager/Director Defendants for breach of their fiduciary duties of loyalty, good faith, and care based upon their acts and omissions as managers and directors of the Debtors.

89.    At all or certain times material hereto, the Manager/Director Defendants served on the boards of managers and directors of the Debtors and, as such, owed the Company a fiduciary duty to discharge their duties in good faith, with the care an ordinarily prudent director in a like position would exercise, and in a manner reasonably believed to be in the best interests of the

Company.

90.     Specifically, the duty of loyalty and good faith under Delaware and Texas law required the Manager/Director Defendants to put the interests of the Company above their own interests and those of others, and was not limited to disloyalty in the classic sense, i.e. self-dealing, personal gain, or a cognizable conflict of interest. In addition, in discharging their duty of loyalty and good faith, the Manager/Director Defendants were required to act in good faith, and would be in breach of the duty of loyalty by acting with a purpose other than that of advancing the best interests of the Company, by acting in violation of applicable positive law, or by failing to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities. The Manager/Director Defendants were also required to ensure that they did not display a lack of diligence that was more culpable than simple inattention or failure to be informed of all facts material to their decisions, such that it was qualitatively more culpable than gross negligence.

91.     Further, in discharging their duties of loyalty and good faith, managers, directors, officers, and control persons are required to monitor operations, and the failure to do so results in liability premised upon "unconsidered inaction," as opposed to affirmative decisions to act or not act. The duty to monitor includes the ability to assure that information and reporting systems exist in the organization that are reasonably designed to provide timely, accurate information sufficient to allow managers, directors, officers, and control persons, each within their scope, to reach informed judgments concerning both compliance with law and business performance.

92.     A sustained or systematic failure to exercise oversight – such as an utter failure to assure that a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability. Thus, "oversight" liability is characterized by a lack of good faith.

93.     The necessary conditions predicate for oversight liability include: (a) the managers, directors, officers, and/or control persons utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention. In either case, imposition of liability requires a showing that the managers, directors, officers, and/or control persons knew that they were not discharging their fiduciary obligations. Where managers, directors, officers, and/or control persons fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

94.     Additionally, the duty to exercise due care under Delaware and Texas law required the Manager/Director Defendants to use that amount of care which ordinarily careful and prudent men would use in similar circumstances and to consider all material information reasonably available. In exercising the duty of due care, the Manager/Director Defendants could not engage in acts or omissions on behalf of the Company that resulted in a loss to such entity arising from decisions that: (i) were ill-advised, uninformed or that failed to consider material information; (ii) constituted an unconsidered failure to act in circumstances in which due attention would, arguably, have prevented the loss; (iii) were based upon an unintelligent or unadvised judgment; (iv) were grossly negligent, such as engaging in an irrational decision making process signifying more than ordinary inadvertence or inattention; or (v) resulted in a corporate strategy that reflected an indifference to the potential risk of harm to the Company, such that reasonable businesspersons would have carefully considered the obvious negative consequences. Moreover, under Delaware and Texas law, the more significant the subject matter of the decision, the greater is the requirement to probe and consider alternatives. To further satisfy the duty of due care, a reasonable and informed deliberative process was required by attending meetings, asking questions, reviewing

written materials, and otherwise becoming informed of relevant information reasonably available, and to seek the input of experts, such as investment bankers, attorneys, and accountants.

95.     In regard to the facts alleged above involving the Company's flagrant business, operational, financial, and compliance deficiencies, and lacking good faith, the Manager/Director Defendants exhibited a knowing, conscious, and reckless disregard for the best interests of the Company and, except for their knowing, conscious, and reckless disregard of the facts, they should have known of the risk of damage that ultimately befell the Company.

96.     Specifically, the Manager/Director Defendants engaged in breaches and abdication of, and conscious disregard for, their fiduciary duties of loyalty, good faith, and care owed to the Company, with breaches that include, but that may not necessarily be limited to:

(a)   causing, acquiescing in, or otherwise allowing the Company to engage in the Improvident Acquisitions and Renovations;

(b)   failing to prevent corporate waste in connection with the Improvident Acquisitions and Renovations;

(c)   failing to implement and/or follow adequate safeguards and controls to ensure reasonably informed decisions regarding the Improvident Acquisitions and Renovations and prevent corporate waste in connection with the Improvident Acquisitions and Renovations;

(d)   failing to fully and properly monitor and oversee the Company in connection with the Improvident Acquisitions and Renovations and to prevent corporate waste in connection with the Improvident Acquisitions and Renovations;

(e)   causing, acquiescing in, or otherwise allowing the Company to engage in the Questionable Business Practices;

(f)   failing to implement and/or follow adequate safeguards and controls to prevent

or rectify the Questionable Business Practices;

(g)   failing to fully and properly monitor and oversee the Company to prevent or rectify the Questionable Business Practices;

(h)   causing, acquiescing in, or otherwise allowing the Company to engage in the Season Pass Scam;

(i)   failing to implement and/or follow adequate safeguards and controls to prevent the Season Pass Scam;

(j)   failing to fully and properly monitor and oversee the Company to prevent the Season Pass Scam;

(k)   causing, acquiescing in, or otherwise allowing the Company to provide materially inaccurate financial information to Secured Lenders and/or other third parties;

(l)   failing to implement and/or follow adequate safeguards and controls to prevent providing of materially inaccurate financial information to Secured Lenders and/or other third parties;

(m)   failing to fully and properly monitor and oversee the Company to prevent providing of materially inaccurate financial information to Secured Lenders and/or other third parties;

(n)   failing to fully, properly, and timely consider options and effectuate an action plan to maximize value of the Debtors;

(o)   failing to implement and/or follow adequate safeguards and controls to ensure full, proper, and timely consideration of options and effectuation of an action plan to maximize value of Debtors;

(p)   failing to fully and properly monitor and oversee the Company to ensure full,

proper, and timely consideration of options and effectuation of an action plan to maximize value of Debtors;

(q)   causing, acquiescing in, or otherwise allowing the Improper Payments;

(r)   failing to implement and/or follow adequate safeguards and controls to prevent the Improper Payments;

(s)   failing to fully and properly monitor and oversee the Company to prevent the Improper Payments;

(t)   causing, acquiescing in, or otherwise allowing the Company's failure to pay the Unpaid Tax Liabilities, thereby suppressing the true, critically impaired and defective business, financial, and operational condition of the Debtors;

(u)   causing, acquiescing in, or otherwise allowing the Company's failure to disclose to the Secured Lenders and other third parties the accrual and existence of Unpaid Tax Liabilities, thereby suppressing the true, critically impaired and defective business, financial, and operational condition of the Debtors;

(v)   causing, allowing, or otherwise acquiescing in the Company's failure to ensure that all necessary and proper safeguards, measures, controls, and actions were employed and/or otherwise undertaken in respect of park operations and making tax payments;

(w)   failing to ensure that sufficient and adequate safeguards or controls were implemented and/or otherwise followed in regard to the business, financial, regulatory, accounting and operational affairs and functions of the Debtors, including park operations and making tax payments;

(x)   failing to fully or properly monitor, oversee, and supervise the financial,

operational, regulatory, accounting and business affairs and functions of the Debtors, including as to park operations and tax payments;

(y) failing to undertake in earnest sale and marketing efforts prior to 2019, despite multiple years of sustained, material operating losses and other material factors supporting an earlier sale process which, but for the lack of adequate safeguards and controls, would have been implemented sooner;

(z) causing, allowing, or otherwise acquiescing in the Company's failure to file or consider filing a bankruptcy or other insolvency proceeding sooner, which would have prevented the accrual of millions of dollars of unpaid tax liabilities, trade debt, and other liabilities;

(aa) causing, allowing, or otherwise acquiescing in the dissemination of materially inaccurate business, financial, operational, and regulatory information to the Secured Lenders and/or other third parties;

(bb) failing to implement and/or follow adequate safeguards or controls in regard to the Company's financial reporting, bookkeeping, regulatory, legal, operational, compliance, business, and accounting functions, which enabled the dissemination of materially inaccurate information, as well as disabling a reasonably informed decision making process in respect of, *inter alia*, the appropriate time to file a bankruptcy or other insolvency proceeding or engage in a sale process prior to 2019;

(cc) in connection with causing, allowing, or otherwise acquiescing in the bad faith dissemination of materially inaccurate business, financial, and operational information, suppressing the true, critically impaired and defective financial, business, and operational condition of the Debtors;

(dd) causing, allowing, or otherwise acquiescing in the continued business, financial, and operational decline of the Debtors and causing or allowing the Debtors to continue to operate well past the point of insolvency, causing substantial harm and damage to the Debtors, including but not limited to substantial increase in the Debtor's liabilities and depletion of assets and enterprise value;

(ee) failing to implement safeguards and controls in regard to material business, operational, and financial functions;

(ff) failing to follow safeguards and controls in regard to material business, operational, and financial functions;

(gg) failing to ensure that business, operational, and financial information was being fully, properly, and accurately reported;

(hh) failing to implement or monitor safeguards and controls to prevent corporate waste;

(ii) failing to fully or properly monitor, oversee, and supervise the Company and its business, operational, and financial functions;

(jj) acting or failing to act in conscious disregard for their fiduciary duties and best interests of the Debtors;

(kk) causing, allowing, or otherwise failing to prevent suppression of the true, critically impaired and defective business, financial, and operational condition of the Debtors;

(ll) failing to properly perform, assist, and engage in all aspects of the Company's business and operations in conscious disregard for their fiduciary duties and best interests of the Debtors;

(mm)  permitting the Company to engage in corporate waste;

(nn) permitting the Company to engage in certain avoidable transfers and make certain improper payments;

(oo) failing to fully or adequately inform themselves in regard to material business, operational, and financial decisions and functions affecting the Company, thereby disabling themselves from making reasonably informed decisions; and

(pp) other breaches and proximately caused damages as may be ascertained through discovery.

97.    The Manager/Director Defendants knew that their acts and omissions as described herein were in breach, abdication, and/or conscious disregard of their respective responsibilities, respective fiduciary duties of loyalty, good faith, and care, and the best interests of the Debtors, and as a result, breached their duty of loyalty by failing to discharge such fiduciary obligations in good faith.

98.    Each of the above breaches adversely impacted and conferred no benefit to the Company, and as a direct and proximate result of same, caused damage to the Company consisting of, *inter alia*: (i) the loss and depletion of valuable assets of the Debtors; (ii) increased liabilities of the Debtors; (iii) the decrease in the asset values and enterprise value of the Debtors; (iv) the increased insolvency of the Debtors; (v) administrative fees and expenses incurred by the Estate during the bankruptcy proceedings related to mitigating and/or rectifying the acts and omissions of the Defendants, and claims filed or asserted against the Estate in respect thereof; (vi) corporate waste; (vii) the value of all Improper Payments and the value of all avoidable transfers pursuant to Chapter 5 of the Bankruptcy Code or under Texas, California, New York, Delaware, or other applicable state law; and (viii) other damages as may be ascertained though discovery.

WHEREFORE, the Trustee demands the entry of judgment against the Manager/Director Defendants for compensatory damages, consequential damages, and special damages including, but not limited to: (i) the loss and depletion of valuable assets of the Debtors; (ii) increased liabilities of the Debtors; (iii) the decrease in the asset values and enterprise value of the Debtors; (iv) the increased insolvency of the Debtors; (v) administrative fees and expenses incurred by the Estate during the bankruptcy proceedings related to mitigating and/or rectifying the acts and omissions of the Defendants, and claims filed or asserted against the Estate in respect thereof; (vi) corporate waste; (vii) the value of all Improper Payments; (viii) the value of all avoidable transfers pursuant to Chapter 5 of the Bankruptcy Code and under Texas, California, New York, Delaware, or other applicable state law; (ix) pursuant to the faithless servant doctrine and application of Section 542(a) of the Bankruptcy Code and/or other applicable law, the disgorgement and turnover of all compensation, salaries, stipends, bonuses, fees, and any and all other payments and benefits paid to Defendants pursuant to; and (x) other damages as may be ascertained though discovery, plus pre-judgment and post-judgment interest, costs and for any other relief the Court deems appropriate.

## **RESERVATION OF RIGHTS**

99.     The Trustee reserves the right to amend this Complaint upon completion of his investigation and discovery in order to assert any additional claims for relief against the Defendants as may be warranted under the circumstances and as otherwise allowed by law.

### **DEMAND FOR JURY TRIAL**
### **AND NON-CONSENT TO A JURY TRIAL**
### **BY AND BEFORE THE BANKRUPTCY COURT**

100.     The Trustee hereby: (i) demands a trial by jury on all claims and issues triable by such; and (ii) requests in regard to such demand that the reference to the Bankruptcy Court not be withdrawn unless and until all discovery and all pre-trial motions and matters, including case

dispositive motions, are disposed of and otherwise adjudicated by the Bankruptcy Court.  The

Trustee specifically does not consent to a jury trial by and before the Bankruptcy Court.

      Dated this 7th day of April, 2022.

LAW OFFICE OF SUSAN E. KAUFMAN, LLC

By:  /s/ Susan E. Kaufman
       Susan E. Kaufman (DSB# 3381)
       *Attorneys for the Chapter 7 Trustee*
       919 North Market Street, Suite 460
       Wilmington, DE 19801
       (302) 472-7420
       (302) 792-7420 Fax
       Email: skaufman@skaufmanlaw.com

CIMO MAZER MARK PLLC
*Special Litigation Counsel*
 *for the Chapter 7 Trustee*
100 S.E. 2nd Street, Suite 3650
Miami, FL 33131
Tel:  (305) 374-6480
Fax: (305) 374-6488

       David C. Cimo, Esq.
       Fla. Bar No. 775400
       Email: dcimo@cmmlawgroup.com
       Marilee A. Mark, Esq.
       Fla. Bar No. 725961
       Email: mmark@cmmlawgroup.com